JULIA M. JAYNE (SBN 202753)
JAYNE LAW GROUP, P.C.
803 Hearst Avenue
Berkeley, CA 94710
Phone: (415) 623-3600
E-Mail: julia@jaynelawgroup.com

PAUL W. VERNER (Pro Hac Vice)
VERNER SIMON
30 Wall Street, 8th Floor
New York, New York 10005
Phone: (212) 502-5500
E-Mail: pwverner@vernerlaw.com

CARLOS F. ORTIZ (Pro Hac Vice)
BAKER HOSTETLER
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: (212)589-4676
E-Mail: cortiz@bakerlaw.com

DANIEL OLMOS (SBN 235319)
NOLAN BARTON OLMOS & LUCIANO, LLP
600 University Avenue
Palo Alto, CA 94301
Phone: (650) 326-2980
E-Mail: dolmos@nbo.law

*Attorneys for Defendant*
ALIAKSANDR KLIMENKA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ALIAKSANDR KLIMENKA,<br><br>Defendant. | Case No. 3:22-cr-00256-SI<br><br>DEFENDANT'S NOTICE AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT<br><br>Date:       May 23, 2025<br>Time:       11:00 a.m.<br>Location:   Courtroom 1<br><br>Before the Honorable Susan Illston<br>United States District Judge |

# MOTION

Defendant Aliaksandr Klimenka, by and through counsel, respectfully moves for an order dismissing the Indictment. This motion is based on the Fifth and Sixth Amendments to the U.S. Constitution and all other applicable statutory and case law. The motion is also based on the instant notice of motion and motion, the attached memorandum of points and authorities, the files and records in this case, and any and all other materials that may come to this Court's attention at the time of the hearing on this motion.

Respectfully submitted,

DATED: March 28, 2025          NOLAN BARTON OLMOS & LUCIANO, LLP


 /s/ Daniel B. Olmos
DANIEL B. OLMOS

Attorney for Defendant
Aliaksandr Klimenka

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES**............................................................1

**INTRODUCTION** ...................................................................................................................1

**FACTUAL AND PROCEDURAL BACKGROUND**................................................................2

**ARGUMENT**...........................................................................................................................5

    I.    Dismissal is required because the government rendered a material fact witness unavailable by sending him abroad despite the government's knowledge that this witness had material evidence with apparent exculpatory value. ............................5

        A.    The governing legal standard.................................................................................5

        B.    The lost evidence here, in the form of testimony from Mr. Vinnik, had apparent exculpatory value before the government rendered this evidence unavailable by sending Mr. Vinnik abroad................................................7

        C.    If a showing of bad faith is required, Mr. Klimenka has made that showing here. ................................................................................................8

        D.    The government's conduct in sending Vinnik to Russia requires dismissing this case.................................................................................11

    II.   Dismissal is also required for selective prosecution in violation of Mr. Klimenka's constitutional right to the equal protection of the law.......................12

**CONCLUSION** .......................................................................................................................13

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The government's investigation into the digital currency exchange BTC-e resulted in indictments against Defendant Aliaksandr Klimenka in the instant case and Defendant Alexander Vinnik in a related case, *United States v. Vinnik*, ND Cal. No. 3:16-cr-227-SI. The gravamen of the government's accusations against Mssrs. Vinnik and Klimenka is that Mr. Vinnik owned and operated BTC-e, an allegedly unlicensed digital currency exchange which was used by individuals to launder proceeds from illegal activity, and that Mr. Klimenka also had legal control or management over the operation of the exchange. The government's case against Mr. Klimenka appears to focus on his alleged relationship with Mr. Vinnik and Mr. Klimenka's role in leasing a server to, and providing a software trading platform for, BTC-e.

In May 2024, Mr. Vinnik pleaded guilty to a money laundering conspiracy as "one of the operators of BTC-e." As part of his plea he admitted to causing a loss of at least $121 million, and he was set to be sentenced in June 2025. Although Mr. Vinnik had been in the United States for over two years and five months, last month the United States government included Mr. Vinnik in a prisoner swap for an American citizen held in Russia, just months before Mr. Klimenka's case is set to go to trial. At the same time, the government elected to dismiss all charges against Mr. Vinnik, including those to which he had already pleaded guilty.

At the outset, counsel for Mr. Klimenka acknowledge the government for the successful return of a United States citizen from Russia. We note that, in order to accomplish this prisoner swap, a Russian citizen likely needed to be exchanged in return. As counsel for Mr. Klimenka, we have no insight into why Mr. Vinnik was chosen for inclusion in this particular exchange, or at this particular time, especially with Mr. Klimenka's trial just a few months away. That said, we are keenly aware of the significant consequences that the sudden and unusual circumstances surrounding Mr. Vinnik's inclusion in this exchange have for Mr. Klimenka and his ability to receive a fair trial. Accordingly, the defense moves for dismissal with prejudice of the Indictment against Mr. Klimenka. First, as described more fully below, the government was

aware prior to the prisoner exchange that Mr. Vinnik's testimony could have exculpated Mr. Klimenka.[1] By including Mr. Vinnik in the exchange and sending him to Russia now, the government violated Mr. Klimenka's Fifth and Sixth Amendment rights to due and compulsory process because Mr. Vinnik is no longer available to the defense at Mr. Klimenka's trial. Second, the government is violating Mr. Klimenka's right to equal protection by selectively prosecuting him based on his non-Russian national origin, whereas Mr. Vinnik's case was dismissed solely because of his Russian origin.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 12, 2022, Mr. Klimenka was charged by Indictment with one count of violating 18 U.S.C. § 1960 (operation of an unlicensed money transmitting business) and one count of violating 18 U.S.C. § 1956(h) (conspiracy to commit money laundering). *See* Docket No. 1. On December 21, 2023, Mr. Klimenka was arrested in Latvia on a provisional warrant. Immediately after being arrested, he waived all formal proceedings in Latvia and agreed to extradition to the United States. On January 28, 2024, Mr. Klimenka made his first appearance in the Northern District of California and, on February 26, 2024, he was released on bond conditions. *See* Docket No. 29.

The Indictment alleges that, between 2011 and July 2017, Mr. Klimenka, along with Mr. Vinnik and others, controlled BTC-e, a digital currency exchange. *See* Docket No. 1. According to the Indictment, BTC-e was one of the world's largest digital currency exchanges, and was one of the primary ways by which cyber criminals around the world transferred, laundered, and stored the criminal proceeds of their illegal activities. *Id*.

In a separate, earlier indictment, Mr. Vinnik was charged with one count of violating 18 U.S.C § 1960 (operation of an unlicensed money services business), one count of violating 18 U.S.C. § 1956(h) (conspiracy to commit money laundering), seventeen counts of violating 18

---

[1] [redacted]

U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i) (money laundering), and two counts of violating 18 U.S.C. § 1957 (engaging in unlawful money transactions). *United States v. Vinnik*, 3:16-cr-227-SI Docket No. 6. All the charges against Mr. Vinnik related to his owning and operating BTC-e. Mr. Vinnik was arrested in Greece in July 2017 and was eventually extradited to the United States in 2022.

Before being extradited to the United States, Mr. Vinnik faced trial in France in October 2020. The French trial similarly concerned allegations of money laundering through BTC-e.[2] A Legal Attaché (LEGAT) attended the trial and wrote daily reports on what occurred during the proceedings. The LEGAT report, attached to this motion as Exhibit A, has been disclosed to the defense in discovery with bates stamping for both "VINNIK" and "KLIMENKA."

According to the LEGAT report, during the French trial Mr. Vinnik "denied being an administrator of BTC-e" and testified that instead he worked for BTC-e as an "operator," meaning he merely executed orders from his superiors and did other tasks that were "assigned to him." Exhibit A at 2. Mr. Vinnik also denied knowing how to program and denied knowing how ransomware operates, stating that he had "nothing to do with [ransomware]." *Id*. Mr. Vinnik testified that he played "only a technical role" for BTC-e transactions, such as "receiving daily assignments from a supervisor whom he could not name." *Id*. at 3. When the prosecutor in the French trial confronted Mr. Vinnik with evidence pointing to his guilt, Mr. Vinnik answered "that he was being prosecuted because he was Russian." *Id*. Mr. Vinnik's defense counsel asked Vinnik questions "as evidence of his innocence," and attacked the prosecution's evidence as "being unreliable[.]" *Id*. at 4.

During closing arguments, one of Mr. Vinnik's attorneys argued that Mr. Vinnik was merely a "simple Russian citizen." *Id*. at 5. This same attorney specifically noted allegations that BTC-e "was used to get an American president elected," almost certainly referring to President Trump's victory in the 2016 presidential election (since this trial occurred in October 2020, before the 2020 election of President Biden). The defense called Mr. Vinnik an "innocent

---

[2] In fact, United States authorities provided discovery to French prosecutors in furtherance of the proceedings there.

man" and argued that "the government provided no proof against Vinnik." *Id*. Mr. Vinnik himself, in his own closing remarks, "said he was innocent." *Id*. Mr. Vinnik also said he was merely not careful and "naïve" when he gave his personal information to BTC-e. *Id*. And Mr. Vinnik said that if he were to be convicted, then he would be "another victim" of the ransomware associated with BTC-e. *Id*. There was no evidence or allegation whatsoever noted in the LEGAT report concerning Mr. Klimenka.

On December 7, 2020, the Judicial Court of Paris handed down its criminal judgment in Mr. Vinnik's case. Despite the numerous overlapping allegations and charges in France, Mr. Vinnik was **acquitted** of 14 criminal counts and convicted of just one count of money laundering. In its judgment, the Paris Court summarized statements made by Mr. Vinnik which are clearly exculpatory to the charges in the instant case. For example, the Court reiterated that Mr. Vinnik stated he was hired merely as an operator for BTC-e: "His work consisted of processing orders for clients of the platform who wanted to convert bitcoins into fiat currency." Judgment at 23. The Court also noted that Vinnik reported that he took his instructions from supervisors whom he could not identify, that they sent him his login information, and that he was unaware that BTC-e conducted unlawful practices. *Id*. Nowhere in the 45-page judgment were Mr. Klimenka or any of his companies mentioned, despite extensive investigations into BTC-e by authorities in Greece, France, the United States, and other countries.

Finally, the LEGAT report closed with a description of the French appellate proceedings ongoing in May 2021, with yet another report that Mr. Vinnik was continuing to profess his innocence: "[T]he defense is expected to continuing [sic] pressing the theme that Vinnik is the innocent victim of a campaign of persecution by the United States[.]" *Id*. at 6.

On August 5, 2022, Mr. Vinnik made his first appearance in the Northern District of California. Vinnik Docket No. 20. On May 3, 2024, Mr. Vinnik pled guilty to violating 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) pursuant to a plea agreement with the government. Vinnik Docket No. 126. However, on February 11, 2025, the government, in a sealed pleading, elected to dismiss its entire case against Mr. Vinnik. Vinnik Docket No. 136.

1  ████████████████████████████████████████████████████████

2  ██████████████████████████████████████████████████

3  ████████████████████████████████████████ Mr. Vinnik was then released from the custody of the U.S. Marshal and returned to Russia in a prisoner swap for an American citizen held in Russia.

Shortly after Mr. Vinnik returned to Russia, he was interviewed by a Russian media outlet and continued to assert his innocence related to the criminal charges brought against him in the Northern District of California. A copy of the interview is submitted as an attachment to this motion as Exhibit B. Referring to the federal charges related to money laundering, to which he had pled guilty but were then dismissed by the same prosecutors assigned to Mr. Klimenka's case, Mr. Vinnik told the Russian interviewer that "there was no evidentiary basis" and added, "They did not have any evidence of my involvement, of my negotiations with someone about any transfers." *Id.* Mr. Vinnik also said about the United States charges, "They accused me of laundering $4 billion or $9 billion, but there was no damage and there were no victims." *Id.*

## ARGUMENT

**I.   Dismissal is required because the government rendered a material fact witness unavailable by sending him abroad despite the government's knowledge that this witness had material evidence with apparent exculpatory value.**

**A.   The governing legal standard.**

For decades, courts have recognized the due process right against having the government render helpful defense witnesses unavailable. The right to due process is implicated when "a material witness's unavailability is attributable to unilateral government action." *United States v. Gonzales*, 617 F.2d 1358, 1363 (9th Cir. 1980). This rule depends on the Fifth Amendment right to due process and the Sixth Amendment right to compulsory process. In *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982), the Supreme Court held that "the Government could offend the Due Process Clause of the Fifth Amendment if, by deporting potential

witnesses, it diminished a defendant's opportunity to put on an effective defense." *California v. Trombetta*, 467 U.S. 479, 486 (1984) (discussing holding of *Valenzuela-Bernal*).

Two years after *Valenzuela-Bernal*, the Supreme Court decided *California v. Trombetta*, which distinguished two categories of lost evidence and set a different standard for those two categories. The first is "potentially exculpatory evidence," and *Trombetta* cited *Valenzuela-Bernal* as a case dealing with that category of evidence. *Trombetta*, 467 U.S. at 486. In general, to show a constitutional violation for the government's loss of potentially exculpatory evidence, the defendant must show bad faith on part of the prosecutor or law enforcement. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). The second category is for evidence that is not merely *potentially* exculpatory but instead has "exculpatory value that was *apparent* before the evidence was destroyed." *Id.* at 489 (emphasis added); *see also Illinois v. Fisher*, 540 U.S. 544, 549 (2004) (noting the distinction between "material exculpatory" evidence in *Trombetta* and the "potentially useful" evidence at issue in *Youngblood*). For evidence in this category, with apparent exculpatory value, "the good or bad faith of the prosecution is irrelevant." *Fisher*, 540 U.S. at 547 (comparing material exculpatory evidence with potentially useful evidence).

The Ninth Circuit has sometimes failed to distinguish the different standards that govern the loss of *apparent* exculpatory evidence (no showing of bad faith required) as opposed to evidence that is only *potentially* exculpatory (defendant must show bad faith). But even in these cases, the court's rulings universally turn on whether the government knew of the evidence's exculpatory value before it was rendered unavailable. For instance, in *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013), the Ninth Circuit noted that a defendant must make two showings to establish a constitutional violation: (1) the government acted in bad faith, and (2) the defendant cannot obtain comparable evidence through other reasonably available means. *Id.* But for the first showing, "the presence or absence of which turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Id.* (cleaned up). Under that standard, the defendant must show bad faith but meets that standard by showing that the evidence has apparent exculpatory value. *Id.* But then *Sivilla*

acknowledged that there are actually two categories of lost evidence, and that the bad-faith showing is required for only one category: "Another configuration of this test requires the showing of bad faith where the evidence is only potentially useful and not materially exculpatory." *Id.* Whatever configuration of the test is used, if evidence has exculpatory value that is <u>apparent</u> when the government renders it unavailable, the loss of that evidence violates the constitution (either because a showing of bad faith is not required, or because the apparent exculpatory value satisfies the required showing of bad faith). "Under either configuration of the test, the inquiry turns on whether any exculpatory value of evidence [at issue] was apparent to the government agents." *Id.*

> **B.      The lost evidence here, in the form of testimony from Mr. Vinnik, had apparent exculpatory value before the government rendered this evidence unavailable by sending Mr. Vinnik abroad.**

The government was in possession of the LEGAT report and the Paris Court's judgment long before it elected to send Mr. Vinnik to Russia in a prisoner swap and dismiss his case, and thus knew the details of Mr. Vinnik's French trial. The government knew that Mr. Vinnik had repeatedly proclaimed his innocence and denied criminal involvement in BTC-e, and knew that he had described himself as an "innocent victim of a campaign of persecution by the United States[.]" Exhibit A at 6. The LEGAT report reveals the apparent exculpatory value of Mr. Vinnik's testimony in Mr. Klimenka's case, including the report's description of Mr. Vinnik's sworn testimony during the French trial. Mr. Vinnik's role in the government's case against Mr. Klimenka is significant—in fact, both the government's reverse proffer to the defense and a 45-page summary document of the government's evidence against Mr. Klimenka focus primarily on a series of chats between Mr. Vinnik and Mr. Klimenka. Clearly Mr. Vinnik's testimony concerning these chats and his relationship with Mr. Klimenka are highly relevant to Mr. Klimenka's defense, and the statements made during Mr. Vinnik's French trial concerning his innocence are exculpatory. The government knew all the information from the LEGAT report and the importance of Mr. Vinnik to their case against Mr. Klimenka before rendering Mr.

Vinnik unavailable by deciding to include him in the exchange and send him abroad at the time that it did. In short, the government had "knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *See Sivilla*, 714 F.3d at 1172.

Even after Mr. Vinnik was sent abroad and had his case dismissed by the U.S. Attorney's Office in the Northern District of California, he continued providing exculpatory evidence related to Mr. Klimenka. After Vinnik left the United States and returned to Russia, he gave an interview to a Russian media outlet. Vinnik told the Russian interviewer that "there was no evidentiary basis" for the criminal charges that the government dismissed against him (the same charges that Mr. Klimenka continues to face in this Court), and added, "They did not have any evidence of my involvement, of my negotiations with someone about any transfers." *See* Exhibit B. Mr. Vinnik also said about his charges in the related case, "They accused me of laundering $4 billion or $9 billion, but there was no damage and there were no victims." *Id.* Although Mr. Vinnik's assertion that "there was no damage and there were no victims" conflicts with his admission in the plea agreement that he was personally responsible for causing a loss of at least $121 million, the government nevertheless elected to dismiss those charges subsequent to his guilty plea. *United States v. Vinnik*, 3:16-cr-227-SI Docket No. 123 at 6:24-25. While these statements to reporters were obviously not in the possession of the government at the time of his release, they are consistent with his exculpatory statements in the French proceedings, and certainly provide a glimpse of what his testimony might have been at Mr. Klimenka's trial. Again, Mr. Vinnik's testimony in the French trial resulted in multiple acquittals. There is no question that Mr. Vinnik's relationship with BTC-e and Mr. Klimenka is central to the allegations in the instant case. Indeed, it is difficult to imagine a more significant impact on the defense case here than losing the ability to present this evidence.

  **C.**  **If a showing of bad faith is required, Mr. Klimenka has made that showing here.**

Again, where the evidence's exculpatory value is apparent before its loss or destruction, as it plainly is here, the good or bad faith of the government is irrelevant. *Fisher*, 540 U.S. at

547 (comparing material exculpatory evidence with potentially useful evidence); *Sivilla*, 714 F.3d at 1172 (the test "requires the showing of bad faith where the evidence *is only potentially useful* and not materially exculpatory" (italics added)); *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1149 (9th Cir. 2012) (explaining that good or bad faith is irrelevant when "material exculpatory evidence" is at issue, in contrast with a showing of bad faith required where the evidence is only potentially useful). Thus, Mr. Klimenka need not demonstrate bad faith.

But even if a showing of bad faith is required, the government here acted in bad faith as that term is used in the applicable legal standard. Bad faith is present because the government had "knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Sivilla*, 714 F.3d at 1172. And they certainly had knowledge of "potentially useful" evidence. Not only did the government make the decision to send Mr. Vinnik back to Russia over other Russian citizens detained in the United States while in possession of this knowledge, it did so a mere five months prior to Mr. Klimenka's trial, where Mr. Vinnik's relationship to Mr. Klimenka would have played a central role.

[redacted]



### D.   The government's conduct in sending Vinnik to Russia requires dismissing this case.

Sanctions against the government are warranted if a defendant "makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela-Bernal*, 458 U.S. at 873.  The Supreme Court added with respect to deported witnesses, sanctions are warranted when "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 874.

That standard for prejudice balances the competing governmental interests.  *See id*. at 864 (noting the government's "dual responsibility" and competing duties when enforcing criminal laws conflicts with the duty to enforce immigration laws, such as when a witness in a criminal case is subject to deportation). This test "balances the defendant's right[s] . . . with the government's interest[.]" *United States v. Leal-Del Carmen*, 697 F.3d 964, 970 (9th Cir. 2012). The United States government may well have an interest in participating in prisoner swaps with other countries in order to bring Americans incarcerated abroad back to the United States. However, that consideration must be weighed against the fact that the United States government did not have to choose to swap Mr. Vinnik – it could have included another Russian national, instead.  This is particularly true in light of the fact that Mr. Klimenka's trial was scheduled to begin just five months from Mr. Vinnik's departure, and Mr. Vinnik could thus have been included in a later swap (or simply had his return to Russia delayed so he could remain available to the defense at Mr. Klimenka's trial).  The plain and unavoidable consequence of this decision by the government is that Mr. Klimenka no longer has access to a witness whose testimony would have been "material and favorable to his defense."

In sum, the government removed a witness with material exculpatory evidence from the United States, in violation of Mr. Klimenka's constitutional rights to due process of law and to compulsory process.  This violation requires dismissing the Indictment against Mr. Klimenka.

**II.     Dismissal is also required for selective prosecution in violation of Mr. Klimenka's constitutional right to equal protection of the law.**

The Indictment must also be dismissed because the government's continued intention to prosecute Mr. Klimenka criminally despite its decision to dismiss all criminal charges against Mr. Vinnik related to the same alleged scheme violates Mr. Klimenka's right to equal protection. The government's discretion in choosing whom to prosecute is not "unfettered." *United States v. Rundo*, 108 F.4th 792, 798 (9th Cir. 2024) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). The constitutional right to equal protection of the law prohibits prosecutions based on arbitrary classifications. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). To prove selective prosecution, defendants need to demonstrate that the decision to prosecute had a "discriminatory effect" and was motivated by a "discriminatory purpose." *United States v. Wilson*, 123 F.4th 1021, 1027 (9th Cir. 2024).

To obtain discovery on a claim of selective prosecution, a defendant "must show *some evidence* of both discriminatory effect and discriminatory intent." *Id.* (quoting and adding emphasis to *United States v. Bass*, 536 U.S. 862, 863 (2002)). Some evidence of discriminatory effect means showing that similarly situated defendants could have been prosecuted but were not, *i.e.*, a "credible showing of different treatment of similarly situated persons." *Id.* (quoting *United States v. Armstrong*, 517 U.S. 456, 470 (1996)).

Here, Mr. Vinnik is a person similarly situated to Mr. Klimenka, but he has been treated differently due to his Russian nationality. Mssrs. Vinnik and Klimenka were charged with money-laundering offenses based solely upon their shared association with BTC-e. The Indictment alleges that both Mr. Vinnik and Mr. Klimenka controlled BTC-e. ECF No. 1, ¶ 4. Despite their similar situations, the government elected to dismiss Mr. Vinnik's case, even after he pleaded guilty, yet the government is persisting with its charges against Mr. Klimenka. This different treatment constitutes discriminatory effect since it is based exclusively on national origin.

Regarding discriminatory intent, the Ninth Circuit recently described the discriminatory-intent factor as "quite muddled" while referring to the lack of a clearly articulated and uniform standard governing that factor. *Wilson*, 123 F.4th at 1029 n.1. Another recent decision noted that discriminatory intent "implies" more than a mere awareness of consequences, and it "implies" that the decisionmaker acted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *United States v. Rundo*, 108 F.4th 792, 805 (9th Cir. 2024) (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985)). Here, the government acted "because of" the arbitrary classification of national origin. Mr. Vinnik got a benefit for being Russian while Mr. Klimenka suffers continued prosecution because he is not. And the federal government continues to maintain that Mr. Vinnik committed an "illegal crime" related to BTC-e, so apparently it was not an assessment of the strength of the case or the evidence against Mr. Vinnik that drove the government's decision to cause this adverse effect on Mr. Klimenka.[3] The government continues to prosecute Mr. Klimenka "because of" his non-Russian national origin, *see Rundo*, 108 F.4th at 792, and elected to forego prosecution against Mr. Vinnik because of his Russian national origin. The charges against Mr. Klimenka must therefore be dismissed.

## CONCLUSION

For the foregoing reasons, Mr. Klimenka respectfully asks the Court to dismiss the Indictment against him.

Respectfully submitted,

DATED: March 28, 2025                NOLAN BARTON OLMOS & LUCIANO, LLP

                                      /s/ Daniel B. Olmos
                                      DANIEL B. OLMOS
                                      Attorney for Defendant Aliaksandr Klimenka

---

[3] White House Press Secretary Karoline Leavitt said of the prisoner exchange that it was a great deal even though Mr. Vinnik committed the "illegal crime."
https://abcnews.go.com/International/russian-held-us-released-wake-fogel-release-kremlin/story?id=118725555